UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:06-CV-288-H

WILLIAM G. WHITE                                                    PLAINTIFF

V.

HARTFORD LIFE INSURANCE CO.
PACIFIC INSURANCE COMPANY, LTD.                          DEFENDANTS

**MEMORANDUM OPINION AND ORDER**

Plaintiff William G. White ("Plaintiff") filed this lawsuit against Defendants Hartford

Life Insurance Company and Pacific Insurance Company, Limited (jointly referred to as

"Defendant")[1] seeking to recover annuity payments which he alleges Hartford wrongfully and/or

negligently paid to another party over a forged endorsement or by direct deposit to an account

without White's authorization.

Now that discovery is complete, White has moved for summary judgment on his claim.

Defendant objects primarily on the grounds of existing disputed material facts.  Hartford opposes

the motion on expected grounds and argues that White's claim is barred by the statute of

limitations and under the equitable doctrines of waiver, laches, and failure to mitigate damages.

However, Hartford has not formally moved for judgment as a matter of law on any of these

grounds.  For the reasons described below, the Court denies White's motion.  In doing so the

Court discusses but does not rule on the statute of limitations issues.

---

[1]This action arises out of a structured settlement annuity contract issued by Hartford Life Insurance Company.  Hartford Accident & Indemnity Copy was the applicant for the contract and Plaintiff was the annuitant. The beneficiary of the annuity contract was Pacific Life Insurance Co., Ltd.

I.

An extensive statement of the facts in a light most favorable to Hartford follows.

On October 7, 1980, White who was employed in Hawaii as a crane operator, suffered back, arm, leg, and neck injuries.  He subsequently filed a worker's compensation claim in Hawaii which was settled under the terms of a Compromise and Settlement Agreement and Release ("Agreement") dated March 4, 1987.  The Agreement provided payments as follows:

> The total amount of $800.00 will be paid to the Claimant each month in a single lump sum, with payments to begin within 30 days of formal approval of this Agreement by the Department of Labor and Industrial Relations, and with said payments *to continue at monthly intervals for the remainder of Claimant's life,* with payments guaranteed to continue for a period of ten years from the date of the first annuity payment to be made to the Claimant or to whomever of Claimant's heir, beneficiaries, representatives, successors, or assigns that Claimant may so designate to receive the same . . .

Pl.'s Depo. Exh. 1 pp. 4-5.

White began receiving monthly checks for $800 from Hartford once the Agreement was approved.  In April or May of 1994, White moved to Louisville, Kentucky to live with his brother, John White and a woman named Thelma Simpson ("Simpson") on Lotus Avenue.  He continued to receive the monthly annuity checks in Louisville.  After Bill arrived in Louisville he began working with his brother doing long-haul trucking which required him to be on the road for weeks at a time.  White opened a checking account in Louisville and deposited $15,000 in it. He gave signature rights on that account to Simpson so that she could get him money while he was on the road, but White says that when he returned from a trucking trip the account had been entirely depleted.  He says that Simpson had explained to him that she had used it to pay a tax bill.

White says that while he was on the road, he arranged for Simpson to call him as mail cam in and read him the address.  If he thought it was important, he would instruct her to open it and see what it was and relay that to him over the phone.  White says that while he was traveling out of town with his brother around March 1995, he received a phone call from Simpson informing him that he had received a letter at the residence he shared with his brother and Simpson from Hartford stating that his annuity payments were ending.  White says he "pretty much took [Simpson's] word for it" that the annuity payments were ending and he did not attempt to contact Hartford to inquire further.  In fact, Hartford continued to mail annuity checks to White at the Lotus Avenue address he had provided to Hartford when he first moved there.

Around July 1995, White, his brother, and Simpson temporarily moved to an apartment on Halsley Court.  Though it is unclear how Hartford learned that White's address had changed, in the months of July-October 1995 Hartford mailed White's annuity checks to Halsley Court.  At some point after October 1995 White, his brother, and Simpson moved back to Lotus Avenue and Hartford resumed sending the annuity checks to White at Lotus Avenue.  So although Hartford mailed the monthly annuity checks to White at the addresses where he was residing, he maintains that from March 1995 onward he never received them. He believes that after Simpson had told him the checks were ending she "was apparently intercepting the checks and cashing them herself." Mot. for Summ. J. 5.  Though some of the checks dated after March 1995 bear the signature "William White," White says that those signatures are forgeries.

In 1996, White stopped living with his brother and Simpson and moved in with his future wife, Roxy White.  Later in the year, White's brother and Simpson moved to a house on Wurtele Avenue.  In August 1996, Hartford received handwritten correspondence stating, "I William

White gave Thelma Simpson power of attorney for me. She is my beneficiary. If you need anything call her".[2] In response to that correspondence, a Hartford employee named Angie Lee mailed a letter stating, in part, "Prior to updating our records we will need Power of Attorney paperwork from the courts appointing Thelma Simons (sic) as such . . . ." Hartford subsequently received a letter dated August 21, 1996 stating, "Angie/ Would you please change William White address from 1033 Lotus Ave to 1502 Wurtele Ave Louisville Ky 40208/ Thank you/ William White." Hartford began sending the annuity checks to White at Wurtele Avenue in December 1996, though White never lived at Wurtele Avenue. On March 21, 1997 Hartford received an Electronic Funds Transfer request purportedly signed by William White instructing it to directly deposit White's annuity payments into Thelma Simpson's checking account. A voided check Simpson's account was attached to the request. Thereafter, Hartford began electronically transferred the annuity payments directly to Simpson's account and mailed paper confirmation notices addressed to White at Wurtele Ave.

Some time after April 1997, Simpson moved with White's brother to Utah Avenue. In 1999 White and his wife moved to Loretto, Kentucky. By at latest January 2000, Hartford's mailed EFT confirmation notices were being returned with an attached notice indicating that the forwarding order had expired. On March 7 and June 1, 2000, Hartford wrote to White at the Utah Avenue address (where White had never resided) requesting an address correction in the form of a notarized letter. Hartford continued to transfer the funds to Simpson's checking account and mail the EFT confirmation notices to Wurtele Avenue through at least the end of

---

[2]Although White does not remember signing the power of attorney document quoted above, he admits that at one point he signed a document which would have allowed Simpson to access his union death benefits, so "she could get the money to help with my burial or whatever." White Dep. 46.

2004.

According to White, some time in early 2005, he received an EFT confirmation notice at his home in Loretto confirming the monthly deposit of $800 into Simpson's account. Precisely what series of events prompted Hartford to send the confirmation to White at his home in Loretto is not clear.  After White received a second such notice the next month, he reports that he and his wife checked with their bank to investigate whether any funds from Hartford had been deposited into their account.  No deposit from Hartford was recorded.  In April 2005, White sent a letter to Hartford stating that he had not received his annuity payments since 1994.  The next month White filled out a criminal complaint intake form with the Jefferson County attorney against Simpson.  In Since June 2005, Hartford has electronically transferring White's monthly annuity payments directly to White's checking account.

White's brother's and Simpson's deposition testimony is evidence that White and Simpson shared a romantic relationship.  White has also been previously convicted for insurance fraud, having been caught in a scheme to register and insure cars and then report them as stolen.

White filed suit on May 25, 2006, seeking $98,400.00 from Hartford, a figure which represents the sum of the monthly annuity payments from March 1995 through and including May 2005.  He also seeks interest at a rate of 8% from the date each monthly payment was due.

In his motion for summary judgment, White argues that Hartford failed to discharge its contractual obligations for each month that Simpson allegedly forged White's endorsement on the checks for payment that Hartford mailed (from March 1995 through March 1997) and for each month that Hartford made annuity payments via EFT to the account allegedly established by Simpson without White's knowledge (from April 1997 through May 2005).  Hartford

5

responds that a reasonable jury could decide that an agency relationship existed between White and Simpson or that White ratified Simpson's actions in directing that the checks be sent to her address and later electronically transferred to her checking account.

II.

The Court begins with the basics.  Hartford's agreement to pay White $800 per month is what the Court will refer to as Hartford's "underlying obligation." Hartford sought to discharge its underlying obligation to White by delivering him a negotiable instrument each month – a check for $800.

Hartford argues that the existence of a principal-agent relationship between Simpson and White would mean that payment to Simpson satisfied payment to White under the terms of the Agreement or that White ratified Simpson's actions as to the annuity payments.  If either of these facts are found to be true a jury could find that Hartford, in part, or for the entire time period at issue fulfilled its contractual obligations.  Moreover, if Simpson is found to be White's authorized agent, her indorsement could be sufficient to validate the transaction and thereby discharge Hartford's liability on the check as well as on the underlying obligation.  This view is in accord with the Restatement (Second) of Agency, which provides:

> (2) If an agent who is authorized to receive a check payable to the principal as conditional payment forges the principal's endorsement to such a check, the maker is relieved of liability to the principal if the drawee bank pays the check and charges the amount to the maker.

Rest. 2d Agency § 178(2) (1958).[3]  Though no reported Kentucky has considered this rule, other

---

[3]Kentucky cases prior to the adoption of Article 3 held that a grant of authority to sign for indorser must by "duly authorized in writing."  *See Kentucky Title Sav. Bank & Trust Co. v. Dunavan*, 266 S.W. 667 (1924). However, the parties have directed the Court to no modern statutory provision providing that authority in the context of negotiable instruments be in writing.

courts have adopted it in analyzing somewhat similar situations. *See Kennerson v. FDIC*, 44 F.3d 19, 30-33 (1st Cir. 1995)(surveying jurisdictions and finding modern trend consistent with Restatement and finding that this common law of agency survives under the UCC).

Evidence about the close romantic relationship between White and Simpson that could lead a jury to conclude that White knew that she was diverting his annuity checks for her own use and let this diversion continue, thereby ratifying her actions. The disputes about the correct inferences from this evidence means that at this time the Court is unable to decide the questions of agency and ratification as a matter of law.[4]  Therefore, White is not entitled to summary judgment.

III.

The Court now considers the framework for addressing the statute of limitations issues. In so doing, the Court begins by discussing White's cause of action, and the time and place this cause of action accrued. White asserts that "fundamentally, the issue in this case is whether or not Hartford has performed its obligation to White under the Agreement and is thus discharged of its obligation." Mot. for Summ. J. 11. Framing the issue as a matter of pure contract law neglects consideration of the legal effect of the issuance of a negotiable instrument, like a check, on an underlying obligation, which is addressed by Article 3 of the Uniform Commercial Code ("UCC"), governing commercial paper and which has been adopted by Kentucky. Ky. Rev. Stat.

---

[4]Both parties refer the Court to the somewhat analogous of *Summerlin v. National Indus., Inc.*, 325 S.E.2d 12 (1985). Though this state court case from North Carolina is of no precedential value in this Court, its analysis is helpful in putting the current dispute in context.

Ann. §§ 355.3-101 *et. seq.*[5]

When a party takes a check for an underlying obligation, that check does not discharge the underlying obligation, but rather suspends the obligation until the check is paid "to a person entitled to enforce" it.  Ky. Rev. Stat. Ann. §§ 335.3-310(2)(a); 355.3-602(1)(b).  In addition to suspending the underlying obligation, a party's decision to issue a negotiable instrument also triggers separate contractual liability on the check itself.

In some cases a party's underlying obligation and the obligation on the negotiable instrument become divided.  This occurs, for example, when a check given for the obligation is stolen from the payee, the payee's signature is forged, and the forger then obtains payment.  In such a situation, per Ky. Rev. Stat. Ann. § 355.3-310(2)(d):

> If the obligee is the person entitled to enforce the instrument but no longer has possession of it because it was lost, stolen, or destroyed, the obligation may not be enforced to the extent of the amount payable on the instrument, and to that extent the obligee's rights against the obligor are limited to enforcement of the instrument.

The Official Comment to this section of Article 3 explains that if the payor bank pays a person not entitled to enforce the instrument, the suspension of the underlying obligation continues, because the check has not been paid within the meaning of § 3-602(a).  §3-310 cmt. 3-4.  Under these circumstances, the payee could sue the depositary or payor bank in conversion under Section 3-420, or the drawer under Section 3-309.  Kentucky has adopted the 2000 Amendment to Section 3-309.[6]

---

[5]Where the Court refers to the Official Comment to the UCC, it will cite to the relevant section as it is labeled in the UCC.  However, in each case, that section is also part of the Kentucky Revised Statutes in Chapter 355.3.

[6]This section provides, in relevant part:
(1) A person not in possession of an instrument is entitled to enforce the instrument if:
(a) The person seeking to enforce the instrument:

However, as the Official Comment explains, "the payee cannot merely ignore the instrument and sue the drawer on the on the underlying contract.  This would impose on the drawer the risk that the check when stolen was indorsed in blank or to the bearer." §3-310 cmt. 4.  In other words, if the payor bank pays the forger, "the suspension on the underlying obligation for which the check was given continues because the check has not been paid." HENRY J. BAILEY & RICHARD B. HAGEDORN, BRADY ON BANK CHECKS: THE LAW OF BANK CHECKS, ¶30.1, (A.S. Pratt & Sons updated 2007)(accessed electronically).

Thus, White's ability to enforce the underlying obligation turns largely on whether the annuity checks could properly be considered "delivered" to him.  "Delivery" in the context of UCC means "voluntary transfer of possession."  Ky. Rev. Stat. Ann. § 355.1-110(14).  If the checks were "delivered", regardless of what happened afterward, §3-310 governs the effect of the check on the underlying obligation.  By contrast however, if the checks were never delivered, White retains his right to enforce the underlying obligation.

A.

---

1. Was entitled to enforce the instrument when loss of possession occurred; or
2. Has directly or indirectly acquired ownership of the instrument from a person who was entitled to enforce the instrument when loss of possession occurred;

(b) The loss of possession was not the result of a transfer by the person or a lawful seizure; and
(c) The person cannot reasonably obtain possession of the instrument because the instrument was destroyed, its whereabouts cannot be determined, or it is in the wrongful possession of an unknown person or a person that cannot be found or is not amenable to service of process.
(2) A person seeking enforcement of an instrument under subsection (1) of this section must prove the terms of the instrument and the person's right to enforce the instrument. If that proof is made, KRS 355.3-308 applies to the case as if the person seeking enforcement had produced the instrument. The court may not enter judgment in favor of the person seeking enforcement unless it finds that the person required to pay the instrument is adequately protected against loss that might occur by reason of a claim by another person to enforce the instrument. Adequate protection may be provided by any reasonable means.

9

Until July 1995, Hartford mailed the annuity checks to the address White had provided and where he actually resided.[7]  As the Official Comment to §3-420, "the payee received delivery when the check comes into the payee's possession, as for example when it is put into the payee's mailbox." §3-420 cmt. 1.  Here, the Court concludes that for at least so long as Hartford mailed his annuity checks to the address that White had provided to Hartford, and where he was actually living, those checks were "delivered" within the meaning of Article 3.[8]  The "delivery" analysis is complicated for the time period when, according to White, someone other than White was notifying Hartford of his changes of address. It appears that from July 1995 until the point at which White moved out in early 1996, Hartford mailed the check to the address where he lived despite White's professed lack of knowledge of such delivery.  At the very least, White had constructive possession of mail delivered to him at the address where he lived. Accordingly, for this period of time White's claim against Hartford arises pursuant to §3-309 of Article 3, and not as a claim to enforce the underlying obligation under contract law. *See* Ky. Rev. Stat. Ann. § 355-3.310.

By contrast, when Hartford began mailing checks to addresses where White had never lived (apparently in December 1996, with delivery to the Wurtele), whether "delivery" occurred, which could operate to suspend Hartford's obligation on the underlying obligation, depends on the disputed agency relationship between White and Simpson and the level of knowledge White

---

[7]White does say that after March 1995 he stopped receiving them because Simpson was allegedly intercepting them.

[8]Kentucky cases holding that attempted payments do not discharge the payor are not to the contrary, as the "common element in each of these cases is that the attempted payment was invalid and worthless." *Cf. Wagner v. Giles*, 209 S.W.3d 489, 491 (Ky. Ct. App. 2006)(holding that attempted payment of promissory notes, which payment was later set aside as a preference in bankruptcy did not operate to discharge any obligation to pay them); *Porter v. Bedell*, 116 S.W.2d 641, 642 (Ky. 1938)(holding that the receipt of a renewal note, the signature on which was forged, did not operate as a payment or discharge of the original note).

had about his annuity checks.  Thus White would retain his rights to enforce Hartford's underlying obligation after December 1996, including when, unless Hartford is successful in proving an agency relationship or actual knowledge on White's behalf.  *See* §355.4A-406 (describing the effect of an electronic funds transfer on an underlying obligation).[9]

In sum, the facts presently before the Court suggest that Hartford suspended its underlying obligation when it sent checks to the address where White lived, and for the time period that this ocurred White is entitled to enforce the check under Article 3.  From December 1996 onward, Hartford's delivery of annuity checks to addresses where White did not reside would not seem to effect "delivery" under the UCC.  On this view, the underlying obligation would  not even be suspended let alone discharged, and White would retain full common law contractual rights to enforce it.

### B.

Identifying Plaintiff's proper cause of action is not merely an academic exercise.  The applicable statute of limitations on Plaintiff's claims may vary depending on the cause of action and where and when it accrued.  The Court should apply the forum state's choice of law provisions in a diversity case. 28 U.S.C. § 1332; *Anderson, Inc. v. Consol, Inc.,* 348 F.3d 496, 501 (6th Cir. 2003).  In framing their arguments on this point, the parties refer to statute of limitations on contracts, which assumes that Plaintiff's cause of action sounds in contract on the underlying obligation.  For the reasons discussed above, this does not appear to be the case.  White's claim would be governed by Article 3 of the UCC only for the period of time when Hartford "delivered" checks to the address where he lived.

---

[9]Article 4A of the UCC governs electronic funds transfers.

11

Article 3 provides a statute of limitations in § 3-118, which provides that a lawsuit under this article must be commenced within three years after a claim for relief accrues.  Ky. Rev. Stat. Ann. §355.3-118(7)(c).  Plaintiff's Article 3 claims to enforce the check against Hartford under the "lost, destroyed, or stolen instrument" section of the UCC, §3-309 could only logically have accrued when the checks were allegedly intercepted or stolen by Simpson.  That White did not discover the theft until later would not toll the statute of limitations in an action against Hartford, because Simpson's alleged fraud and not Hartford's which prevented White from discovering the theft.  Thus, White's Article 3 claims would seem to expire three years from the last date that Hartford mailed the annuity payments to a mailbox at the address where White was residing.

White's proper cause of action for the annuity payments when no delivery occurred arises under the underlying obligation, the common law of contract.[10]  Hartford argues that Kentucky's borrowing statute should point this Court to apply Connecticut's six year statute of limitations because that is where the cause of action accrues, as that is where Hartford miscalculated White's payments, and from where the erroneous payments originated.  The applicability of the Kentucky borrowing statute depends on:

(1) Whether the cause of action accrued in another state;
(2) If the cause of action did accrue in another state, whether the state's statute of limitations for a particular cause of action is shorter than the corresponding Kentucky statute of limitations; and
(3) If the accrual state's statute of limitations is shorter than Kentucky's, then the statute of limitation of the accrual state is applied; but if the statute of limitations for the cause of action in the accrual state is longer than Kentucky's, then apply Kentucky's statute of limitations.

---

[10]Of course, if Hartford succeeds in proving either actual knowledge or a principal-agent relationship between White and Simpson, the jury may well conclude that Hartford fulfilled its contractual payment obligations which would incidentally also satisfy the "delivery" requirement under Article 3.

*Combs v. International Ins. Co.*, 163 F. Supp. 2d 686, 691 (E.D. Ky. 2001)(quoting *Willits v. Peabody Coal Co.*, 188 F.3d 510 (6th Cir. 1999)(table).

      The key factor in the analysis of the borrowing statue is where the cause of action accrued. *Combs*, 163 F. Supp. 2d at 691 (E.D. Ky. 2001). The Sixth Circuit, applying Kentucky law, considered this question in *Willits.* There, the single defendant had an obligation to calculate royalty payments and mail them to many individuals "in their various states of residence." The Sixth Circuit concluded that the cause of action accrued where the defendant had made the miscalculations. *Willits* specifically rejected the proposition that a breach of contract cause of action accrued at "the time and place where that is not done which ought to be done." *Combs*, 163 F. Supp. 2d at 692. In considering failure to pay an insurance contact to a claimant in Kentucky, Judge Forester noted the lack of "Kentucky authority for the proposition that a breach of contract action accrues under the borrowing statute where the obligation is not paid" and concluded that the breach occurred where the insurance company decided to deny coverage. *Id.*

      Following this reasoning, the mere fact that Kentucky was the place of payment does not mean that the cause of action accrued in Kentucky. Thus, the Court finds persuasive Hartford's argument that the alleged breach of Hartford's obligation to pay the annuity payments occurred in Connecticut where Hartford honored the requests to send each month payments, via mail, and later via EFT transfer to locations and bank accounts allegedly not connected to White. For this reason Connecticut's six-year statute of limitations for written contracts would probably apply instead of Kentucky's fifteen year statute of limitations.

C.

Next, the Court will discuss *when* the cause of action might accrue.  Those issues,

however, have not been briefed to the Court's satisfaction.

White suggests that the contract for monthly installment payments should be continuous

in nature, such that the statute of limitations does not being to run until the contract's

termination.  *Adika v. Smith*, 466 F.3d 503 (6th Cir. 2006).  By contrast, for a contract that is

severable in nature, the statute of limitations begins to run on each particular part of the contract

when a party breaches that part.  *Id.* at 507.  White directs the Court's attention to *Allapattah*

*Servs. v. Exxon Corp.*, 188 F.R.D. 667, 680 (S.D. Fla. 1999), which the Sixth Circuit

characterized as a "well written" opinion explaining the difference:

> Under [the continuing breach] doctrine, a cause of action for breach of contract does not
> being to accrue upon the initial breach; rather, on contracts providing serial performance
> by the parties, accrual of a breach of contract cause of action commences upon the
> occurrence of the last breach or upon termination of the contract.

*Id.* at 680.

Here, the Court is faced with Hartford's single continuing contract which, calls for serial

performance by Hartford in the form of monthly payments.  Under these circumstances, and in

the absence of Connecticut law directly on point, the Court must determine whether White's

cause of action, to the extent it arises under contract law, is continuous or severable.

IV.

Hartford also raises several affirmative defenses, which merit brief discussion now, and

more argument later.   The first is that "Bill White's conscious refusal to investigate the

unexplained loss of $800.00 a month, especially in light of his knowledge that Thelma Simpson

14

had already misappropriated $15,000.00 of his money, amounted to a waiver of his rights to pursue a claim against Hartford . . ." Waiver is "a voluntary and intentional surrender or relinquishment of a known right, or an election to forego an advantage which the party at his option might have demanded or insisted upon." *Conesco Finance Servicing Corp. v. Wilder*, 47 S.W.3d 335, 344 (Ky. Ct. App. 2001). Though White may have been less than diligent in investigating why he was no longer receiving his checks from Hartford, his failure to affirmatively investigate does not, without more, appear to constitute a waiver under Kentucky law.

Nor can the Court confidently invoke the doctrine of laches to bar White's claim, at least at this time. Under Kentucky law:

> 'Laches' in its general definition is laxness; an unreasonable dely in asserting a right. In its legal significance, it is not merely delay, but delay that results in injury or works a disadvantage to the adverse party . . . .What is the equity of the case is the controlling question.

*Plaza Condominium Ass'n.., Inc. v. Wellington Corp.*, 920 S.W.2d 51, 54 (Ky. 1996). In this case, though a simple call to Hartford may have prevented White's loss, it seems that Hartford could also have been more diligent in how it attempted to discharge its contractual obligation to pay White. This equitable defense cannot be invoked against a plaintiff who did not know his rights, and there must be something more than mere delay. *Fergerson v. Utilities Elkhorn Coal Co.*, 313 S.W.2d 395, 400 (Ky. 1958). Because White's knowledge of Hartford's continued payments, or Simpson's receipt of them is contested by the parties, the doctrine of laches does not appear to bar White's claims.

Hartford also asserts that because White failed to mitigate his damages when he did not

15

exercise "reasonable diligence in investigating why his lifetime benefits abruptly halted" and thereby permitted Hartford to pay the wrong party for several years.  The doctrine of mitigation readily applies upon a finding by one party that the other party to a contract has breached it. *See, e.g., Davis v. Fischer Single Family Homes, Ltd.,* 231 S.W.3d 767, 780 (Ky. Ct. App. 2007); *United States Bond & Mortgage Corp. v. Berry*, 61 S.W.2d 293, 298 (Ky. 1933).  In this case, however, White allegedly did not know that Hartford was in breach of its underlying obligation, rather he says that he thought that Hartford had some legal basis for discontinuing his monthly payment.  White's professed lack of knowledge of Hartford's alleged breach at the very least suggests that he may not have been in position to mitigate his damages and that doctrine does not dispose of the instant dispute.

V.

To summarize, the relationship between White and Simpson and White's level of knowledge about the continuance of his annuity checks after March 1995 remain sufficiently in dispute to preclude summary judgment in favor of White.  Though it may well be difficult for Hartford to prove any agency or ratification, at this point the evidence may well present such a reasonable inference.

The Court offers much of its above analysis with respect to the suspension and discharge of Hartford's underlying obligation without the benefit of the parties' briefing on the effect of "delivery" on the underlying obligation but in an effort to put the facts of this case in the proper context of Article 3 and Kentucky contract law.  Application of Article 3 to the facts of this case suggests to the Court that at least some of White's claims (those which arose when Hartford "delivered" a check to White) may well be barred by the three-year statute of limitations

contained in Article 3.  The Court is, however, amenable to future briefing by the parties on the

statute of limitations issue and is receptive to any further clarification of the facts that the parties

can provide.  The Court will set a conference to set a further briefing schedule and a trial date.

Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that White's motion for summary judgment is DENIED.

This is NOT a final order.

cc:    Counsel of Record